1

2

3

4

5

6          UNITED STATES DISTRICT COURT

7          EASTERN DISTRICT OF CALIFORNIA

8

9    HERIBERTO BOTELLO,                    No.  1:12-cv-01702-BAM  HC

10              Petitioner,               **ORDER DENYING PETITION**
                                          **FOR WRIT OF HABEAS CORPUS**
11        v.

12   SCOTT FRAUENHEIM, Warden at
     Pleasant Valley State Prison,
13
                Respondent.
14

15        Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus

16   pursuant to 28 U.S.C. § 2254.[1]  As grounds for a grant of the writ, Petitioner claims (1) convicting

17   him of kidnap for robbery violated due process since the State did not prove he intended to rob

18   the victim prior to the kidnap; (2) resentencing Petitioner to a longer term violated due process;

19   (3) applying the gang enhancement violated due process since the State did not prove intent; (4)

20   imposing a life sentence constituted cruel and unusual punishment; (5(E)) appellate counsel's

21   failure to raise the issues set forth in the habeas petition constituted ineffective assistance of

22   counsel in violation of the Sixth Amendment; and (6(F)) finding West Side Tula to be a criminal

23   street gang in the absence of sufficient evidence violated due process.[2]

24

25

26   _____
     [1] Pursuant to 28 U.S.C. § 636(c)(1), both parties consented, in writing, to the jurisdiction of a United States
27     Magistrate Judge to conduct all further proceedings in this case, including the entry of final judgment.
     [2] The order of Petitioner's claims varies in the petition and his supporting brief.  The petition designates the six
28   claims 1-4, E, and F.  The Court will identify Petitioner's claims using the order in which the claims are alleged in
     the petition. *See* Doc. 11 at 4-5.

                                          1

1

## I.  **Factual Background**

2

3
In its decision addressing Petitioner's direct appeal, the California Court of Appeal found

the following facts:

4

5
> Justin Hawkins testified that he and Jesus Salazar are members of
> the "Bulldog gang" and that the "enemies" of the Bulldog gang
> include the "Norteños."

6

7
> On May 19, 2007, Hawkins and Salazar were walking down an
> alley when they encountered [Petitioner] and his codefendant,
> Armand Torres.  [Petitioner] and Torres asked Hawkins and Salazar
> who they were and where they were from.  Salazar responded that
> they were members of the Bulldog gang from Laton, at which point
> [Petitioner] and Torres pulled out guns.  Hawkins ran off, hid
> behind a car, and called police on his cell phone.

8

9

10

11
> Salazar testified [Petitioner] and Torres "beat him up" using their
> guns, and then forced him into the back seat of a car.  The car
> belonged to Adrian Vasquez.  Vasquez drove off; he testified
> Torres sat next to him, [Petitioner] and Salazar sat in the back, and
> both [Petitioner] and Torres were holding guns.  Salazar testified
> that while in the car, he was struck multiple times with a gun.  At
> some point, Salazar's belongings—including an earring, a knife,
> and a necklace—were taken from him.  The earring was taken from
> him when he was in the alley, before he was forced into the car.

12

13

14

15

16
> Vasquez testified to the following:  He drove "out into the
> countryside . . . ."  As he drove, [Petitioner] struck Salazar in the
> face with his hand multiple times, and Torres, "[a]t some points,"
> pointed a gun at Salazar.

17

18

19
> Hawkins testified that after he ran away, he placed a telephone call
> to Salazar's cell phone, and a person whose voice he did not
> recognize answered.  Vasquez testified that while he was driving,
> he heard [Petitioner] say to someone during a telephone
> conversation that Salazar's name would appear in the newspaper.  It
> was Vasquez's understanding that [Petitioner] was referring to the
> obituary section of the newspaper.

20

21

22
> *Gang Evidence*

23
> City of Tulare Police Officer Jesus Guzman qualified as an expert
> on criminal street gangs and testified in that capacity as follows:

24

25
> The group known as the Norteños "began in the prison system" and
> expanded "from the prisons to the streets."  The group has 500 to
> 800 members in the City of Tulare, and it "identif[ies]" with a
> common name," viz., "Northers," and with the following
> "symbols": the "huelga bird," the number 14, and the color red.
> Primary activities of the group include robbery, carjacking,

26

27

28

homicide, attempted homicide, witness intimidation, and felonious assault.

In 2005, Ruben Valdez, a Norteño gang member shot a "suspected" rival gang member. The crime was "part of the pattern of Norteño criminal street gang activity in the County of Tulare." Also in 2005, another Norteño gang member, Lupe Doporto, made a death threat to a witness in the Valdez case. This crime was also part of the pattern of Norteño gang activity in Tulare County.

The Norteños' rivals "would be southern gang members, Sureños, Bulldogs." The Bulldogs are a criminal street gang. Some members of the Norteños identify themselves as "being part of " the group known as the "West Side Tula gang" (WST), which Officer Guzman characterized as a "clique" of the Norteños. Cliques, such as the WST, "follow orders" from the Norteños.

Officer Guzman testified that [Petitioner] is a member of a northern affiliated gang" in Tulare, and that "West Side Tula" is the specific gang in the City of Tulare that . . . he is affiliated with or a member of[.]" The Norteños "claim" the entire City of Tulare as their territory, and the WST claim "anything [in] the west side of Tulare."

City of Tulare Police Officer Matt Machado testified that he made contact with [Petitioner] in December 2005, at which time[Petitioner], who was wearing a red cloth belt, stated that he was a member of the WST.

In response to a hypothetical question, Officer Guzman testified to the following: The offenses described in the question were "part of a pattern of Norteño criminal street gang activity[.]"[3] Such offenses would be committed "to benefit the . . . Norteño gang" because gun pointing at a rival gang member, forcing him into a car, taking his belongings, and then driving him out to the country would be interpreted as "putting a rival gang member down." The perpetrators would "gain . . . respect from the Norteño criminal street gang for that activity[.]"

*People v. Botello*, 2010 WL 3372757 at *3-*5 (Cal.App. Aug. 27, 2010) (No. F058331).

///

---

[3] The hypothetical question posited the following: Two "active Bulldog gang members" are walking down a particular alley in the direction of a specified address in the City of Tulare. Two men (assailants) "confront[] them and ask "where are you from, do you bang[?]" One of the Bulldog gang members (BGM 1) responds, "Laton dog." The assailants "pull out guns, stick them at [BGM 1]," and his companion (BGM 2) "takes off running." The assailants "proceed to take the property of [BGM 1] and put him into a car and transport him out into the county [*sic*]." The assailants " pistol whip [the victim], rob him of his phone while he is . . . out in the county [*sic*] area . . . ." During the course of the cart ride, BGM 2 places a call to BGM 1's cell phone, and one of the assailants answers and calls BGM 2 a "mutt or a bull frog." Items bearing gang indicia about which the officer had testified earlier were found the next day in the house at the address referred to above. One of the assailants admits he is a WST member.

1    **II.    Procedural Background**

2         A felony complaint filed May 22, 2007, charged Petitioner and co-defendants Adrian

3    Vasquez and Armand Torres with kidnapping to commit another crime (robbery) (Cal. Penal

4    Code §209(b)(1)), two counts of intentional discharge of a firearm (Cal. Penal Code

5    § 12022.53(c) and (e)(1), and assault with a firearm (Cal. Penal Code § 245(a)(2)).  The

6    complaint included a special allegation of street terrorism (Cal. Penal Code § 186.22(b)(1)(a)).

7

8         Petitioner and co-defendant Torres[4] were tried before a jury on May 14, 18, 19, and 20,

9    2009.  Petitioner did not testify.  On May 20, 2009, the jury found Petitioner guilty of kidnapping

10   for robbery (Cal. Penal Code § 209(b)) (count one), and two counts of assault with a firearm on

11   victim Jesus Salazar (Cal. Penal Code § 245(a)(2)) (counts 3 and 4).  With regard to each count,

12   the jury found to be true the special allegation that Petitioner committed the crime for the benefit

13   of, in association with, or at the direction of a street gang (Cal. Penal Code § 186.22(b)) and that a

14   principal personally used a handgun (Cal. Penal Code §12022.53(b)).

15

16        On June 25, 2009, the Tulare County Superior Court sentenced Petitioner to (count 1) a

17   life term with possibility of parole plus ten years for personal use of a handgun (Cal. Penal Code

18   § 12022.53(b)); (count 3) the midterm of 3 years plus an additional and consecutive 10 years for

19   the gang enhancement (Cal. Penal Code § 186.22(b)(1)(C)) plus 4 years for firearm use (Cal.

20   Penal Code § 12022.5(A)) for a total of 17 years, concurrent to count 1; (count 4) the midterm of

21   3 years plus 10 years for the gang enhancement (Cal. Penal Code § 186.22(b)(1)(C)), concurrent

22   to count 1; and (count 5) the midterm of 2 years plus an additional and consecutive 5 years for the

23   gang enhancement (Cal. Penal Code § 186.22(b)(1)(C)), concurrent to count 1.  *See* Lodged Doc.

24   12 at 791-92.

25

26   ///

27
_____
28   [4] Prior to trial, former codefendant Vasquez entered into a plea deal with prosecutors and agreed to testify against the
     other codefendants.

On July 20, 2009, the trial court heard argument on a motion by the State to correct Petitioner's sentence to reflect a correct sentence on count one.  The court clarified the intended sentence:

> The initial paperwork, if you will, indicated that it was a life sentence taking into consideration Penal Code Section 186.22.  And it is the Court's intent to continue with that, understanding that the numbers that it reflects is that Count 1 with the gang allegation is 15 to life.  And the Court was clear that the Court was running consecutive the enhancement of 12022.53 for a consecutive 10 years.

Lodged Doc. 13 at 802.

On August 27, 2010, the Court of Appeals denied Petitioner's direct appeal but found an error in the abstract of judgment.  It directed the Superior Court to revise the abstract of judgment to reflect that the court imposed a concurrent sentence on the count 3 offense and accompanying enhancements.[5]  The Court of Appeals denied Petitioner's petition for rehearing on September 8, 2010.  On December 15, 2010, the California Supreme Court denied Petitioner's petition for review.

On March 1, 2012, Petitioner filed a petition for writ of habeas corpus in Tulare County Superior Court.  The Superior Court denied the petition on March 5, 2012.  On May 17, 2012, the Court of Appeal denied the petition without prejudice, noting that it was unable to determine whether Petitioner had exhausted all of his claims since he had failed to provide the appellate court with a copy of his petition to the Superior Court.  The California Supreme Court summarily denied the habeas petition on September 26, 2012.

III.   **Standard of Review**

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United

---

[5] This correction was consistent with the sentence articulated at the sentencing hearing.  *See* Lodged Doc. 12 at 791-92.

5

States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  On April 24, 1996,

Congress enacted the AEDPA, which applies to all petitions for writ of habeas corpus filed

thereafter.  *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997).  Under the statutory terms, the petition

in this case is governed by the AEDPA's provisions because Petitioner filed it after April 24,

1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of

the merits of a guilty verdict rendered in state court.  *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5

(1979) (Stevens, J., concurring).  Habeas corpus relief is intended to address only "extreme

malfunctions" in state criminal justice proceedings.  *Id.*  Under the AEDPA, a petitioner can

prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> 28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state

court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)."  *Harrington v. Richter*,

562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly

established Federal law, as determined by the Supreme Court of the United States."  *Lockyer*, 538

U.S. at 71.  To do so, the Court must look to the holdings, as opposed to the dicta, of the Supreme

Court's decisions at the time of the relevant state-court decision.  *Id.*  The court must then

consider whether the state court's decision was "contrary to, or involved an unreasonable

application of, clearly established Federal law."  *Id.* at 72.  The state court need not have cited

clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  The federal court must apply the presumption that state courts know and follow the law.  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent.  *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

The AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable.  *Harrington*, 562 U.S. at 102.  "A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Lockyer*, 538 U.S. at 75-76.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## IV.    Due Process: Sufficiency of the Evidence

Petitioner presents three claims in which he charges that his due process rights were violated by the insufficiency of the evidence to prove the charges on which he was convicted.  In claim 1, Petitioner alleges that the evidence did not prove that he and his codefendant kidnapped the victim with the intent to rob him.  In claim 3, he contends that the evidence did not support a conclusion that Petitioner committed the crimes to benefit a street gang.  Finally, in claim 6(F), Petitioner contends that no evidence established that West Side Tula was a criminal street gang.

### A.    Standard of Review

To determine whether the evidence supporting a conviction is so insufficient that it violates the constitutional guarantee of due process of law, a court evaluating a habeas petition

must carefully review the record to determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Windham v. Merkle*, 163 F.3d 1092, 1101 (9th Cir. 1998). It must consider the evidence in the light most favorable to the prosecution, assuming that the trier of fact weighed the evidence, resolved conflicting evidence, and drew reasonable inferences from the facts in the manner that most supports the verdict. *Jackson*, 443 U.S. at 319; *Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997). The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the trier of fact could reasonably have reached its verdict. *United States v. Mares*, 940 F.2d 455, 458 (9th Cir. 1991).

## B.      Intent to Rob Kidnapped Victim

Petitioner first claims that his conviction on the charge of kidnap for robbery violated his due process rights because the prosecution failed to prove that he intended the rob the victim before the kidnapping. Petitioner reasons that since he did not know that the victim had a cell phone until it rang in the car following the abduction, he could not have intended to steal it when he kidnapped the victim. Although Petitioner raised this issue in his state habeas petition, the Superior Court declined to address it in detail, apparently including it within its general statement that "Petitioner . . . has failed to raise any issue to the level of a prima facie showing that his constitutional rights have been violated." *In re Botello*, Lodged Doc. 22.

To convict a defendant of kidnapping for robbery in California, the robbery need not occur after the victim has been abducted.[6] A California Court of Appeal explained:

> Robbery, unlike burglary, is not confined to a fixed locus, but is frequently spread over a considerable distance and varying periods of time. (*People v. Ketchel*, 59 Cal. 2d 503, 523 . . .; *People v. Jackson*, 273 Cal.App.2d 248, 253 . . . .) It is settled that the crime

---

[6] In his brief, Petitioner asserts that the prosecutor lessened the State's burden of proof by misstating applicable law. In fact, the prosecutor accurately stated the law as set forth in this decision. The Court will not address further the assertion of prosecutorial misconduct.

> of robbery is not confined to the act of taking property from victims.  The nature of the crime also is such that a robber's escape with his loot is just as important to the execution of the crime as obtaining possession of the loot.  Thus, the crime of robbery is not complete until the robber has won his way to a place of temporary safety.  (*People v. Carroll*, 1 Cal.3d 581, 585 . . . *People v. Anderson*, 64 Cal.2d 633, 638 . . . *People v. Ketchel*, 59 Cal.2d at 538 . . . .)

*People v. Beaumeister*, 17 Cal.App.3d 996, 1004 (1971).

Thus, even if it is assumed that Petitioner and his codefendants took all of their loot except the cell phone before abducting Salazar, the evidence introduced at trial was sufficient to prove all elements of kidnapping for robbery.  As such, the jury could reasonably have concluded that Petitioner was guilty of kidnapping for robbery, and in evaluating the habeas petition, the Superior Court could reasonably dismiss this claim as not making a prima facie showing that a constitutional right had been violated.

C. **Proof Supporting Gang Enhancement**

Emphasizing that neither he nor his codefendant testified regarding their reasons for committing the crime, Petitioner contends in claim three that no proof other than the gang expert's testimony supported the jury's conclusion that Petitioner committed the crimes for the benefit of a street gang.  In claim six, Petitioner contends that the evidence did not establish that the West Side Tula was a criminal street gang.

Unlike his challenge to the kidnapping for robbery conviction, Petitioner's claim of insufficient evidence to support the jury's application of the gang enhancement focusses on the quantity and quality of the evidence itself.  His arguments, particularly with regard to the question of whether the crimes were intended to benefit West Side Tula, assume that intent cannot be proven in the absence of direct evidence, such as the testimony of Petitioner or his codefendant.  His assumption is incorrect.

The State will typically present expert testimony to prove the elements of the criminal street gang enhancement.  *People v. Hernandez*, 33 Cal.4th 1040, 1047-48 (2004).   Generally, the gang expert renders his opinion based on facts set forth in a hypothetical question based on facts shown by evidence presented in the case.  *People v. Ward*, 36 Cal.4th 186, 209 (2005).  The

question directs the expert to render his opinion assuming the truth of the facts that form the basis of the hypothetical question.  *Id.*   Nonetheless, "[a] gang expert's testimony alone is insufficient to find an offense gang related."  *People v. Ochoa*, 179 Cal.App.4[th] 650, 657 (2009).  In addition to the expert's opinion, the evidence must provide a substantive evidentiary basis from which the jury could reasonably infer the crime was gang related.  *Id.* at 660. In this case, the gang expert also provided information concerning gang indicia and the operation of the West Side Tula, a smaller entity within the Norteño gang, as well as explaining how evidence seized in a search of the codefendant's home could be considered to be evidence of gang affiliation.  He also explained how certain details of the crime reflected gang values and expected behaviors.

### 1.    West Side Tulas as a Criminal Street Gang

A criminal street gang is an ongoing organization, association, or group of three or more persons, whether formal or informal, with a common name or common identifying sign or symbol, that has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute, and whose members who either individually or collectively engage in a "pattern of criminal gang activity."  Cal. Penal Code § 186.22(f).  Petitioner claims that the evidence presented at his trial was not sufficient to establish that the West Side Tulas was a criminal street gang.

Testifying as an expert witness on criminal street gangs, Officer Guzman testified about the history and development of the Norteño street gang, which grew from a prison gang to one active on city streets.  Officer Guzman estimated Norteño membership in Tulare alone to total 500 to 800 members.  The gang was identified by the name, "Northers," and symbols including the huelga bird, the number 14, and the color red.  Northers have a hierarchal governing structure, with specific individuals directing the group's activities.[7]

The Norteños claim all of the City of Tulare as their territory.  West Side Tula, also known as WST, was a clique governed by the Norteños, that claimed as its territory the west side of Tulare (as defined by the railroad tracks).  Other portions of Tulare were claimed by the East Side Tula and Vang Klan Posse, also cliques affiliated with and taking orders from the Norteños.

---

[7] At trial, the defense sometimes referred to Norteños as the "northern structure."

1    Sureños, Bulldogs, and other southern gangs are the Norteños' enemies or rivals.  The

2    Norteños also target drop-outs from any gang.  Their criminal activities include robbery,

3    carjacking, homicide, attempted homicide, witness intimidation, and felonious assault.  Members

4    use their vehicles in drive-by shootings and other crimes.  Officer Guzman testified to two

5    "predicate offenses":  Norteño Ruben Valdez's 2005 shooting of a suspected rival gang member

6    and Norteño Lupe Doporto's death threats to a witness in Valdez's case.

7    Officer Guzman explained the gang concept of being caught "slipping," that is, being

8    caught by police or rival gang members while alone or outnumbered in a place in which one does

9    not belong.  Gang members enter the territory of a rival gang at their own risk.  Such an incursion

10    is a sign of disrespect to the gang claiming the territory.  Accordingly, if Norteños encounter

11    unidentified young men in Tulare, they will ask the strangers their place of origin and whether

12    they are gang members ("do you bang?").  Gang culture demands that a member proudly

13    acknowledge his gang, even in situation where such candor is risky.  When the strangers disclose

14    that they are enemies or rivals, trouble is likely.  The prosecution contended that the offenses in

15    this case occurred when Petitioner and Torres caught Salazar and Hawkins slipping in WST

16    territory.

17    The prosecution questioned Officer Guzman regarding photographs and various items

18    found in a search of codefendant Torres' home the day after the attack on Salazar.[8]  The officer

19    identified various unique Norteño gang references including items marked "ene" ("N" in Spanish)

20    and "Corco" (referring to the Norteño gang active in Corcoran, California, where codefendant

21    Torres previously lived); a "TCN" (Tulare County Norteño) hat; graffiti including "WST," "14,"

22    "Tulare," "norte livin," "X14" and "X4" (N is the 14th letter of the alphabet), "East Side Tula,"

23    and "TCN 559"; and red clothing. Officer Guzman explained that the phrase "114 percent

24    buster," referred to 114 percent pride in being a Norteño, and co-opted the term, "buster," which

25    rivals use derogatorily to refer to Norteños.  He pointed out that Norteños cross out the "S" when

26    it occurs in graffiti or other markings as a sign of disrespect for their Sureño rivals.  He also

27    identified a Norteño slogan: "Can't stop, won't stop."  In response to the prosecutor's questioning

28    _____

[8] Earlier testimony indicated that Petitioner frequented Torres' home and was the boyfriend of Torres' sister.

1   about items recovered in the search of Torres' home, Officer Guzman opined that it would be

2   unusual to find items marked with Norteño symbols and sayings in the homes of persons who

3   were not Norteño members.[9]

4          City of Tulare Police Officer Matt Machado testified that in an interaction with Petitioner

5   in 2005, Petitioner, who was wearing a red cloth belt, stated that he was a member of West Side

6   Tulas.

7          When considered in a light favorable to the prosecution, this evidence is sufficient to

8   allow a rational trier of fact to conclude that West Side Tula was a criminal street gang, as defined

9   in Cal. Penal Code § 186.22(f).

10                  **2.      Felonies Commited to Promote a Street Gang**

11         California law provides for enhanced punishment of "any person who is convicted of a

12  felony committed for the benefit of, at the direction of, or in association with any criminal street

13  gang,  with the specific intent to promote, further, or assist in any criminal conduct by gang

14  members." Cal. Penal Code § 186.22(b)(1).  The crime itself must have some connection with the

15  gang's activities.  *In re Frank S.*, 141 Cal.App.4th 1192, 1199 (2006).  Mere membership in the

16  gang does not establish the gang enhancement.  *People v. Gardeley*, 14 Cal.4th 605, 623-624

17  (1997).

18         The prosecution presented a detailed hypothetical question:

19              We have been talking about two Bulldogs.  Just assume they are
20              active Bulldog gang members.  One has a tattoo of Laton on his
                arm.

21              They are walking down an alley of the alley [*sic*] heading towards
                521 West Tulare Avenue, the location you are familiar with.  And
22              they are confronted by two gentlemen leaving the porch of 551 [*sic*]
                West Tulare.  And the two gentlemen—one of them says where are
23              you from, do you bang.  And one of the Bulldogs responds Laton
                dog.
24
                The two gentlemen leaving the 521 West Tulare house pull out
25              guns, stick them at the guy who responded Laton Bulldog, and the
                other Bulldog takes off running.  They proceed to take the property
26

27  ───────────────
    [9] In earlier testimony, Torres' mother had denied that the various items bearing gang-related symbols or language or
28  both indicated the presence on one or more gang members in the home in which she lived with her family, including
    codefendant Torres.

of the one Bulldog and put him into a car and transport him out into the county.

They pistol whip him, rob him of his phone while he is out in county lines or out in the county area and eventually leave him out there. And during this car ride then assume that the other Bulldog who ran away calls the phone, and one of the Bulldogs who confront him in the alley and got into the car then calls the other Bulldog who calls on the phone a mutt or bull frog. This entire robbery and the movement of him into the county, do you have an opinion based on those facts—and let me add one more thing.

The indicia I have showed you in court in regards to 521 Tulare, let's assume that that indicia was located the next day inside that house. And one of the people, one of the other gentlemen involved in this incident drew a gun and self admitted as being a West Side Tula gang member.

Do you have an opinion whether the incident in this hypothetical was done for the benefit of or in association with a Norteño criminal street gang?

Officer Guzman responded, "Well, it's obviously done to benefit the gang, Norteño gang." Lodged Doc. 10 at 523. He explained his reasons:

Well, they intimidate this Bulldog gang member by pointing a gun at him. Intimidation. They force him into the car so you know that they are rival gang members, they also, you know, disrespect him by taking his belongings, then driving him out into the county.

Lodged Doc. 10 at 523-24.

The officer explained that by robbing a rival gang member of his property, you are putting down that person and his gang. The perpetrators would gain respect from their own gang when they brag to their friends that they caught two bullfrogs slipping and relieved them of their property. The stolen property would serve as physical evidence of the successful confrontation and their manliness. Officer Guzman added that the use of the term "bullfrog," by itself, indicates a gang-motivated assault since that derogatory term would only be used by members of rival gangs.

Viewing these facts in a light favorable to the prosecution, a rational jurist could reasonably conclude that that Petitioner and his codefendant confronted, then assaulted, robbed, and kidnapped the victim at the direction of, or in association with, West Side Tula.

///

13

**V.    Due Process: Resentencing**

In his second claim, Petitioner contends that the trial court violated his right to due process when it increased his sentence on count one by eight years, from an original sentence of 17 years to life (7 years to life for the kidnap for robbery and 10 years for the gun enhancement).[10]  Petitioner misunderstands what happened in the course of his sentencing. Although the probation department recommended that Petitioner be sentenced to 17 years to life in prison on count one, the trial court rejected that recommendation in the original sentencing hearing and imposed a sentence of 25 years to life in prison.  That sentence was not changed at the subsequent hearing to re-examine Petitioner's sentence.  As a result, claim two does not state a cognizable claim.

The probation report prepared for Petitioner's sentencing recommended that on "Count 1, the defendant be committed to state prison for an indeterminate term of life, with the possibility of parole, plus fifteen years pursuant to special allegation Sections 186.22(b)(1)(B) PC and 12022.53(b) PC."  Lodged Doc. 4 at 798.  At the sentencing hearing, the deputy district attorney contended that the probation department's recommendation erroneously applied the statutes, resulting in a sentence that was five years too long.  He argued that under California Penal Code § 186.22(b)(1)(B), when a defendant is sentenced to a life sentence with the gang enhancement, the appropriate term is 15 years to life imprisonment.  When a firearm enhancement (Cal. Penal Code § 12022.53(b)) also applies, as it did in Petitioner's case, the court must add an additional ten years to the 15-year-to-life sentence, yielding a term of 25 years to life.  The trial judge concurred with his reasoning.  *See colloquy at* Lodged Doc. 12 at 785-788.  When pronouncing the sentence on count one, the trial judge did not specify that the life term was a term of 15 years to life, but stated only: "In Count 1, the defendant is committed to state prison for the term of life

---

[10] In addressing this claim, the Court does not consider the concurring terms imposed on the other counts on which Petitioner was convicted.  Petitioner concedes that these counts remained unchanged.  Doc. 11 at 15.

with the possibility of parole with an additional and consecutive 10 years pursuant to 12022.53(b)

which is consecutive to the life term for count 1 of 209B."  Lodged Doc. 12 at 792.  The Clerk's

minutes fully reflected the sentence on count one as follows:

> Count 1   Fifteen to life with the possibility of parole
>
> Enhancement: PC 186.22(b)(1)(b)—included in count 1
>
> Enhancement PC 12022.53(b)—10 years consecutive
>
> Lodged Doc. 4 at 803.

On July 16, 2009, Petitioner filed a motion challenging the determination that Penal Code

§ 186.22(b)(5) required a consecutive 15-year-to-life sentence and contending that under *People

v. Lopez* (34 Cal.4th 1002 (2005)), the court was prohibited from imposing an additional 10-year

term under Penal Code § 186.22.  The State opposed the motion.  When the trial court heard

argument on July 20, 2009, Petitioner's attorney argued that the additional ten-year term of

imprisonment for the gang enhancement resulted in petitioner's being punished twice for his gang

affiliation.  *See* Lodged Doc. 13 at 800.  The Court pointed out that the additional ten-year

sentence related to the firearm enhancement since the gang enhancement was already reflected in

the 15-year-to-life term.  Following a recess to permit the Court to review the transcripts of the

sentencing hearing, the Court stated:

> The record will reflect that all parties are present and Mr. Greco and
> Mr. Reyes and the Court just conferred and actually requested and
> were able to get read back as to portions of the sentencing hearing
> that had taken place previously.
>
> And to sum it up, the concern of the people was that the Court - -
> there had been a lengthy dissertation between the prosecutor and
> the Court as to the life sentence associated with Count 1.
>
> * * * * *
>
> And the fact that the difference between Count 1 without a gang
> allegation would be a 7 to life, whereas Count 1 with a gang
> allegation would be a 15 to life.
>
> The Court did not state on the record that it was a 15 to life.  But
> the Court also never stayed or struck the gang allegation.

///

15

> The Court is mindful that the Court has the ability to do that. The Court is empowered to either stay or strike the gang allegation as to Count 1. It's not the Court's intent to do that.
>
> The initial paperwork, if you will, indicated that it was a life sentence taking into consideration Penal Code Section 186.22. And it is the Court's intent to continue with that, understanding that the numbers that that reflects is that Count 1 with the gang allegation is a 15 to life. And the Court was clear that the Court was running consecutive the enhancement of 12022.53 for a consecutive 10 years.

Lodged Doc. 13 at 801-02.

The determination at the July 20, 2009, hearing clarified any possible ambiguity present in the transcript of the sentencing hearing and the written sentencing order, but it did not increase Petitioner's sentence, which was and remained 25 years to life in prison. Petitioner's claim that his due process rights were violated by an increase in his sentence has no basis in the record. The state courts reasonably rejected this claim.

## VI.     Cruel and Unusual Punishment

In ground four of the petition, Petitioner contends that imposing a life sentence on a juvenile constitutes cruel and unusual punishment in violation of the Eighth Amendment if the crimes of which the juvenile was convicted do not include murder, attempted murder, or three strikes. Petitioner (born July 31, 1989) was 17 years and 10 months old on the date of the crimes of which he was convicted.

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII. Courts determine whether punishment is cruel or unusual by looking beyond historical conceptions to "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

Whether a sentence violates the Eighth Amendment's prohibition of cruel and unusual punishment requires the court to determine whether the term is grossly disproportionate to the offense. *Lockyer*, 538 U.S. at 72. What constitutes a grossly disproportionate sentence is unclear. *Id.* "[T]he only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross disproportionality principle, the precise contours of which

are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." *Id.* at 73.  Successful challenges based on disproportionality are "exceedingly rare."  *Solem v. Helm*, 463 U.S. 277, 289-90 (1983).

Petitioner relies on vague dicta in *Roper v. Simmons* (543 U.S. 551, 568 (2005)) that "juvenile offenders cannot with reliability be classified among the worst offenders."  In *Roper*, the Supreme Court prohibited execution of individuals who committed a capital crime when under 18 years of age as violating the Eighth Amendment ban of cruel and unusual punishment.

California did not classify Petitioner among "the worst offenders," as the term was used in *Roper* to refer to individuals suitably punished by death.  The State sentenced Petitioner to an aggregate term of 25 years to life based on a felony conviction of kidnapping for robbery, with sentencing enhancements resulting from Petitioner's use of a gun and participation in a crime to further the criminal street gang to which he belonged.  To conclude that Petitioner's sentence violates the Eight Amendment prohibition against cruel and unusual punishment, the Court must find that the sentence is disproportionate to his crime.

Respondent contends that the U.S. Supreme Court has not held that sentencing a juvenile to life with parole constitutes cruel and unusual punishment.  He contrasts this absence of authority to the Supreme Court's decisions in *Graham v. Florida* (560 U.S. 48 (2010)) and *Miller v. Alabama* (132 S.Ct. 2455 (2012)), which prohibited as cruel and unusual life sentences without parole for juveniles convicted of both homicide and offenses that are not homicide.  Both decisions analyzed the proportionality standard by considering whether appropriate punishment varied when applied to juveniles as a category.  The Court acknowledged that even for a juvenile offender convicted of an offense that is not homicide, a life sentence may be appropriate:

> A state is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime.  What the State must do, however, is to give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.  It is for the State, in the first instance, to explore the means and mechanisms for compliance.  It bears emphasis, however, that while the Eighth Amendment prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender within his natural life.  Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of

17

incarceration for the duration of their lives. The Eighth
Amendment does not foreclose the possibility that persons
convicted of nonhomicide crimes committed before adulthood will
remain behind bars for life. It does prohibit States from making the
judgment at the outset that those offenders will never be fit to
reenter society.

*Graham*, 560 U.S. at 75.

No Supreme Court case holds that a juvenile offender convicted of crime(s) less than

homicide, attempted homicide, or a felony triggering enhanced sentencing such as California's

"three-strikes" law may not be sentenced to a life term with the possibility of parole. In fact, the

Supreme Court's holding in *Graham* explicitly contemplated that a juvenile convicted of a

nonhomicide crime could receive a life sentence as long as it included a possibility of parole. In

denying Petitioner's claim of cruel and unusual punishment, the California courts reasonably

applied established law.

## VII. <u>Ineffective Assistance of Counsel</u>

Finally, Petitioner contends that he received ineffective assistance of appellate counsel

because his counsel failed to raise the grounds set forth in claims one through five.

The purpose of the Sixth Amendment right to counsel is to ensure that the defendant

receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "[T]he right to counsel

is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14

(1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's

conduct so undermined the proper functioning of the adversarial process that the trial cannot be

relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate

that his trial counsel's performance "fell below an objective standard of reasonableness" at the

time of trial and "that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Id.* at 688, 694. The *Strickland*

test requires Petitioner to establish two elements: (1) his attorney's representation was deficient

and (2) prejudice. *Id.* at 698. These elements need not be considered in order. *Id.* at 697. "The

object of an ineffectiveness claim is not to grade counsel's performance." *Id.* If a court can

1   resolve an ineffectiveness claim by finding a lack of prejudice, it need not consider whether

2   counsel's performance was deficient. *Id.*

3      Since Petitioner cannot prevail on any of the first five grounds alleged in the petition,

4   appellate counsel's failure to raise these grounds cannot be said to have prejudiced Petitioner.

5   The state courts reasonably denied Petitioner's claim of ineffective assistance of counsel.

6   **VIII.   Certificate of Appealability**

7      A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a

8   district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v.*

9   *Cockrell*, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a

10  certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a)  In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b)  There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—
>
> > (A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a state court; or
> > (B)  the final order in a proceeding under section 2255.
>
> (2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

///

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court declines to issue a certificate of appealability.

## IX.  Conclusion and Order

The petition for writ of habeas corpus pursuant to 42 U.S.C. § 2254 is hereby DENIED. The Court declines to issue a certificate of appealability and directs the Clerk of Court to enter judgment and close the case.


IT IS SO ORDERED.

Dated:   **January 5, 2016**                        /s/ *Barbara A. McAuliffe*

                                                                   UNITED STATES MAGISTRATE JUDGE

20